# IN THE SUPREME COURT, STATE OF WYOMING

## 2024 WY 74

### APRIL TERM, A.D. 2024

### July 16, 2024

| | |
|---|---|
| CHADWICK R. TRAYLOR, <br><br> Appellant <br> (Plaintiff/Counterclaim Defendant), <br><br> v. <br><br> KEVIN J. KRAFT; DAVINA M. GREEN; DAVID W. GREEN and BRIAN DANDURAND, <br><br> Appellees <br> (Defendants/Counterclaim Plaintiffs). <br><br> CHADWICK R. TRAYLOR, <br><br> Appellant <br> (Plaintiff/Counterclaim Defendant), <br><br> v. <br><br> DAVINA M. GREEN; DAVID W. GREEN and BRIAN DANDURAND, <br><br> Appellees <br> (Defendants/Counterclaim Plaintiffs). | S-23-0257, S-23-0258 |

*Appeal from the District Court of Natrona County*
*The Honorable Kerri M. Johnson, Judge*

*Representing Appellant:*
    Jason M. Tangeman, Nicholas & Tangeman, LLC, Laramie, Wyoming.

*Representing Appellee Kevin J. Kraft:*
    Ryan P. Healy, Healy Law Firm, LLC, Sheridan, Wyoming.

*Representing Appellee Davina and David Green:*
    Richard R. Wilking, Richard R. Wilking Law Office, Casper, Wyoming.

*Representing Appellee Brian Dandurand:*
    Tara B. Nethercott, Crowley Fleck PLPP, Cheyenne, Wyoming.

*Before FOX, C.J., and BOOMGAARDEN, GRAY, FENN and JAROSH, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**FOX, Chief Justice.**

[¶1]    Chadwick R. Traylor sued individuals named as beneficiaries under his father's trust. He sought to have the trust set aside based on allegations that certain defendants exerted undue influence on his father, causing him to amend his trust. Following a bench trial, the district court denied Mr. Traylor's claims and ruled that the trust's no-contest clause was enforceable against him. We affirm.

### *ISSUES*

[¶2]    Mr. Traylor presents four issues that we rephrase as follows:

> 1.    Did the district court err in striking Mr. Traylor's jury demand?
>
> 2.    Did the district court apply the correct burden of proof when it denied Mr. Traylor's undue influence claims?
>
> 3.    Did the district court err in concluding the trust's no-contest clause was enforceable against Mr. Traylor?
>
> 4.    Did the district court err in its award of costs?

### *FACTS*

[¶3]    This appeal stems from a challenge to the testamentary trust of Donald R. Traylor ("Doc"), who died in August 2021.[1] He had one adult son, Chadwick Traylor, and two grandchildren. Doc and his son were estranged. The last time Mr. Traylor was in Doc's physical presence was in 2014 for approximately one hour, and the last time Doc saw his grandchildren was in 2007.

[¶4]    Doc was a chiropractic doctor in Casper, Wyoming until he retired in 2006. After his retirement, he purchased a home in Florida where he typically lived in the fall and winter months, returning to Casper for the spring and summer months. In Florida, Doc became friends with his neighbors, Tami and Shannon White, and in early 2019, he asked them for assistance with, and recommendations for, his estate plan. The Whites referred him to their estate planning attorney, and Doc executed a revocable trust that named Chadwick Traylor and Shannon White as successor co-trustees. That trust was amended

---

[1] Because there is no challenge to the district court's findings of fact, these facts are drawn from those findings.

1

five months later to add and change certain bequests, but the bequests to Mr. Traylor and his children remained the same, and Mr. Traylor remained a successor trustee.

[¶5]    In June 2019, the Whites drove Doc back to Casper. While the Whites were in Casper, Tami White introduced herself to Doc's neighbor, Davina Green, and asked her if she would walk Doc's dog, Sophie, and keep an eye on Doc, and Ms. Green agreed. Doc paid Ms. Green to walk Sophie and grew close to both Ms. Green and her husband, David.

[¶6]    Around this time, Doc met Brian Dandurand. Doc's handyman in Casper, Rusty Hessler, called Mr. Dandurand to assist with unloading Doc's furniture from Florida and introduced him to Doc. They had to wait eight to nine hours for the moving truck to arrive, and during that time Doc and Mr. Dandurand got to know each other. Their relationship continued to grow after that, and Doc came to rely on Mr. Dandurand as his handyman.

[¶7]    In October 2019, Mr. Dandurand drove Doc to Florida for the winter, and in June 2020, he flew to Florida and drove Doc back to Casper. On Doc's 2020 return to Casper, the Greens resumed caring for Sophie and checking in on Doc, and Mr. Dandurand continued to be his handyman.

[¶8]    In August 2020, Ms. Green checked on Doc and found that he had fallen and was unable to get up. Doc was hospitalized for five days and was diagnosed with stage IV metastatic prostate cancer. While the cancer was treatable, and treatment could extend his life, Doc declined treatment for the cancer.

[¶9]    When Doc was discharged from the hospital, he required 24/7 care, and Ms. Green suggested he engage Mel's Helping Hands (MHH), a company owned by Melody and Kevin Kraft. Doc did so, but he soon required significantly less assistance from MHH as his ability to care for himself improved. The Greens and Mr. Dandurand and his family also became more involved in helping Doc with his daily living needs.

[¶10]  Shortly after MHH began providing services to Doc, he informed Ms. Kraft that he would like to discuss his finances and make changes to the estate plan he had had prepared in Florida. Ms. Kraft asked her husband to meet with Doc because he had a background in finance. During that meeting, Doc gave Mr. Kraft the impression he had assets and investments in excess of ten million dollars. Doc informed Mr. Kraft that the estate plan he had prepared in Florida was not what he wanted, and he asked Mr. Kraft to obtain a copy of it.

[¶11]  Mr. Kraft obtained a copy of the estate plan and instructed Cheryl Wallace, one of Doc's favorite MHH caregivers, to go through the plan with Doc. He did not instruct Ms. Wallace to have Doc make any changes. Ms. Wallace met alone with Doc in his home

2

and made handwritten changes to the documents as Doc directed. Mr. Kraft forwarded the estate plan with the handwritten changes to a financial planner, who then contacted attorney Harry Durham. Mr. Durham agreed to assist Doc in revising his estate plan.

[¶12]  Because Doc could no longer drive, Mr. Kraft drove him to his first meeting with Mr. Durham in October 2020. Mr. Durham did not know Mr. Kraft, and although Mr. Kraft sat in on their meeting, he only spoke, according to Mr. Durham, when Doc asked him if he would act as successor trustee and if a fee of $150,000 would be adequate for his service in that role. Mr. Kraft agreed to serve as successor trustee and responded that the fee was adequate.

[¶13]  Mr. Durham revised Doc's estate plan and met with him in November 2020 to review the revised documents. Mr. Kraft again drove Doc to Mr. Durham's office, but Mr. Durham asked him to wait in another room while he and Doc reviewed the documents. They spent approximately an hour reviewing the documents, with Doc reading each document. Mr. Durham had no concerns with Doc's ability to understand the documents, and at the conclusion of the meeting, Doc executed the documents, including a pour-over will and the Second Amendment and Restated Donald R. Traylor Revocable Trust (Second Amended Trust), both of which were in effect at the time of his death.

[¶14]  Under the terms of the Second Amended Trust Mr. Traylor and his children remained beneficiaries, but at a reduced level. Their original bequest of $200,000 each was reduced to $100,000 each, and the one-third residual interest each was originally bequeathed was reduced to 10.58%. The Second Amended Trust otherwise left various amounts to several of Doc's friends, including Mr. Dandurand and the Greens. The Second Amended Trust left Mr. Dandurand $200,000 and a 21.6% residual interest in the trust proceeds. It left the same to the Greens and named Ms. Green trustee of a $100,000 pet trust with an individual gift to her of $20,000. Mr. Kraft was not a beneficiary under Doc's will or the Second Amended Trust but was named executor and successor trustee for which he was to receive the agreed-upon $150,000 fee.

[¶15]  Ms. Wallace became concerned that the Krafts only cared about Doc's money and resigned from her position with MHH. In February 2021, her husband reported a suspected exploitation of a vulnerable adult to the Wyoming Department of Family Services, and that report was forwarded to the Casper Police Department. Detective Shannon Daley investigated and spoke with Doc. She concluded no evidence supported the suspicion and that Doc was "very well taken care of, articulate, and aware of what he was doing and how his funds were being used."

[¶16]  Doc died August 13, 2021. His trust held property totaling approximately $4,000,000, including a Florida home, a Casper home, a mountain home in Natrona County, vehicles, and financial accounts.

[¶17]  On January 3, 2022, Mr. Traylor filed a complaint against Mr. Kraft, the Greens, and Mr. Dandurand (collectively Defendants) alleging they exercised undue influence on Doc, which caused him to change his will and trust and to make inter vivos transfers of money and property to them. Mr. Traylor sought to have the Second Amended Trust set aside on this ground and on the ground that Doc was incompetent to execute the instruments.[2] Mr. Traylor named the other beneficiaries under Doc's will and trust, except his children, as W.R.C.P. 19(a)(2) defendants, but he made no allegations of undue influence against them. On January 3, Mr. Traylor also filed a jury demand, but he did not serve the demand on Defendants until June 3, 2022.

[¶18]  In March 2022, Defendants separately filed amended answers and counterclaimed for enforcement of the Second Amended Trust's no-contest clause. Mr. Traylor filed his answers to the counterclaims on March 24 and 28. Only two of the seven Rule 19 defendants filed responsive pleadings. Lilia Howard responded on April 19, 2022, and Tami White responded on March 15, 2023.

[¶19]  When the district court prepared its initial pretrial schedule, it set a jury trial. However, during an initial pretrial and scheduling conference held on June 1, 2022, the court learned Defendants believed the trial was to be a bench trial. The court kept the matter set as a jury trial with the understanding that Defendants would be filing objections, which the court would consider.

[¶20]  On June 3, 2022, Mr. Traylor filed notice that the jury demand had been served on Defendants. Defendants moved to strike the demand arguing that Mr. Traylor waived his right to a jury trial when he failed to timely serve Defendants with it. Mr. Traylor opposed the motions to strike. He argued the clock had not begun to run on service of the jury demand because not all the Rule 19 defendants had answered, and his demand was thus timely served. He further contended that by setting a jury trial, the court had already granted him discretionary relief under W.R.C.P. 39(b), which allows the court to set a matter for a jury trial even when it has not been properly demanded. As further justification for the court's exercise of its discretion under Rule 39(b), he asserted it was early in the case and the Defendants would not be prejudiced by the setting.

[¶21]  On August 8, 2022, the district court granted the motions to strike, ruling that Mr. Traylor waived his right to a jury trial by failing to timely serve Defendants with the jury demand. The court then reset the matter for a May 2023 bench trial. Several months later, on January 4, 2023, Mr. Traylor filed a motion asking the district court to reconsider its order striking his jury demand. Following a hearing, the court denied the motion.

---

[2] Before trial, Mr. Traylor withdrew his claim that Doc was incompetent to execute the estate documents.

4

[¶22]   During the seven-day bench trial, Defendants each testified concerning the length and nature of their relationship with Doc. Additionally, several witnesses testified to Doc's state of mind when he executed the Second Amended Trust. Mr. Durham, who prepared the amended estate documents, testified that Doc appeared sharp and strong-willed, and he had no concerns about his ability to understand or make decisions. Dr. Michael Miller, one of Doc's treating physicians, testified that although Doc's cancer was serious and advanced, he "didn't have any reason to believe that he was altered at all." Dr. Miller considered Doc's judgment and insight to be "normal." Dr. Brandon Trojan, another of Doc's treating physicians, testified that he "had no concerns about Doc's mental capacity in mid-August 2020." In his opinion, "Doc's mental status, speech, and thought content/perception were all normal, Doc was oriented to person, place and time, and Doc was able to answer all his questions appropriately." A long-term friend of Doc's, Judy Sambrano, testified that she visited Doc almost weekly and he "was the same strong-willed person he had always been."

[¶23]   The district court ruled that Mr. Traylor failed to prove his undue influence claims. In so ruling, the court found that while Mr. Traylor proved that Doc's reliance on Defendants gave them the opportunity to control his testamentary acts, there was no persuasive evidence they acted on that opportunity. The court further found that Mr. Traylor had failed to prove "Doc's condition was such as to permit subversion of his free will." Last, the court found that Mr. Traylor failed to prove the Defendants unduly profited as beneficiaries under Doc's trust. The court thus denied Mr. Traylor's claims for relief.

[¶24]   As to Defendants' counterclaims seeking to enforce the no-contest clause of the Second Amended Trust, the district court found the language of the clause to be unambiguous and enforceable against Mr. Traylor. The court thus granted Defendants' counterclaims and ruled that Mr. Traylor was no longer entitled to benefits under the Second Amended Trust.

[¶25]   After the district court issued its ruling, Mr. Dandurand and the Greens each moved for an award of costs pursuant to W.R.C.P. 54. Mr. Traylor objected to each motion. The court granted both motions for costs for the reasons stated in the motions, and on the additional ground that Mr. Traylor's responses to the motions were untimely. Mr. Traylor filed a W.R.C.P. 60(b) motion requesting the court set aside its ruling that his responses were untimely. The court granted that request but otherwise left the orders awarding costs unaffected.

## DISCUSSION

### I.      The district court did not err in striking Mr. Traylor's jury demand.

5

**A.** **Mr. Traylor failed to timely serve his jury demand on Defendants and therefore waived his right to a jury trial.**

[¶26] The question of whether Mr. Traylor waived his right to a jury trial presents a constitutional question that we review de novo. *Int. of NP*, 2017 WY 18, ¶ 11, 389 P.3d 787, 790 (Wyo. 2017) (citing *In re CRA*, 2016 WY 24, ¶ 15, 368 P.3d 294, 298 (Wyo. 2016)).

[¶27] W.R.C.P. 38 governs the right to a jury trial. It provides:

> Any party may demand a trial by jury of any issue triable of right by a jury by (A) serving upon the other parties a demand therefor in writing at any time after the commencement of the action and not later than 14 days after service of the last pleading directed to such issue, and (B) filing the demand as required by Rule 5(d). Such demand may be indorsed upon a pleading of the party.

W.R.C.P. 38(b)(1) (2023). Rule 38 further provides that "[t]he failure of a party to properly serve and file a jury demand as required by this rule constitutes a waiver by the party of trial by jury." W.R.C.P. 38(d).

[¶28] Defendants moved to strike Mr. Traylor's jury demand arguing that Mr. Traylor waived his right to a jury trial when he failed to serve the demand on Defendants within fourteen days of his answer to their counterclaims. The district court agreed service was untimely and struck the demand. Mr. Traylor claims the court erred because only two of the Rule 19 defendants had answered and the fourteen-day clock would not have run until all defendants had answered. We disagree.

[¶29] This Court has recognized how Rule 38 operates in a case with multiple defendants.

> If there are multiple defendants, the time each defendant files his answer starts the [fourteen]-day period running for the issues raised between him and the plaintiff but on an issue in which all the defendants are interested the time runs from service of the last answer.

*Scherling v. Kilgore*, 599 P.2d 1352. 1356 (Wyo. 1979); *see also In re Kaiser Steel Corp.*, 911 F.2d 380, 388 (10th Cir. 1990) ("Where there are multiple parties, the last pleading by any party on a common issue will determine the time for jury demand."); 9 Charles A. Wright et al., *Fed. Prac. and Proc.: Civil* § 2320 (4th ed. April 2023 update)

("The timeliness of a jury trial demand is judged by its relationship to the pleadings and the issues raised in them.").

[¶30]  The issues between Mr. Traylor and Defendants were Mr. Traylor's allegations of undue influence against Defendants and Defendants' counterclaims against Mr. Traylor for enforcement of the Second Amended Trust's no-contest clause. These were not issues shared by the Rule 19 defendants, and Mr. Traylor has not asserted otherwise. Mr. Traylor made no allegations of undue influence against the Rule 19 defendants, and the Defendants' counterclaims were between them and Mr. Traylor. Once Mr. Traylor replied to the counterclaims, his time for serving a jury demand began to run. *See Kyle v. Apollomax, LLC*, 2012 WL 4963370, * 2 (D. Del. 2012) (pleadings between defendants and third-party defendant did not extend time for plaintiff to demand jury trial on issues between plaintiff and defendants); *Garcia v. Salt River Project Agric. Improvement & Power Dist.*, 2005 WL 3113162, * 2 (D. Ariz. 2005) (time for serving jury demand ran separately from final pleadings between plaintiff and two defendants where allegations against each defendant differed).

[¶31] Mr. Traylor replied to Defendants' counterclaims on March 24 and 28, 2022, which closed the pleadings directed to the issues between Defendants and him. The June 2022 service of his jury demand on Defendants was well past the fourteen days within which he had to serve the demand and was thus untimely.

[¶32]  Even if the Rule 19 defendants' general interest in the outcome of the litigation were considered an issue to which the pleadings were directed, only one Rule 19 defendant timely answered Mr. Traylor's complaint.[3] That answer was filed on April 19, 2022, meaning Mr. Traylor's June 3 jury demand remained untimely, even if his time for service ran from that pleading.

[¶33]  We reject Mr. Traylor's argument that the failure of several Rule 19 defendants to answer his complaint extended the time to serve his jury demand. In support of this argument, Mr. Traylor cites *Ford Motor Credit Co. v. Esposito*, 2010 WL 3489123 (W.D. Penn. 2010). In that case, the plaintiff creditor sued two defendants as guarantors of a debt owed to the plaintiff. *Ford Credit*, 2010 WL 3489123, * 1. One of the defendants answered and about four months later filed a jury demand. *Id*. After the plaintiff sought and obtained an entry of default against the other defendant, it moved to strike the answering defendant's jury demand as untimely. *Id*. The court denied the motion, holding:

---

[3] Ms. Howard's single-page pro se answer stated a general disagreement with the complaint's allegations and did not assert a counterclaim. Ms. White, also a Rule 19 defendant, filed a pro se answer, without leave of court, on March 15, 2023, two months before trial.

> Ford Credit appears to be arguing . . . that because Defendant Bean never filed a pleading (and thus subsequently had a default judgment entered against her), the jury trial demand expired 14 days from the date of Esposito's answer. The more logical course would be to hold that so long as a defendant remains in a case, and has not been removed by default judgment or otherwise, its failure to file a pleading extends the deadline for all parties to demand a jury trial until 14 days after its pleading or it is removed.

*Id*. at 4.

[¶34]   Under the circumstances of this case, we are unpersuaded by the *Ford Credit* rule. In *Ford Credit*, it was a defendant who sought the jury trial, after his co-defendant had failed to answer but before there was an entry of default. A defendant has no control over whether or when entry of default is sought against a co-defendant who fails to answer. As this case illustrates, that control is in the plaintiff's hands. When it is a plaintiff who seeks to rely on a defaulting defendant's failure to answer to extend the time for filing and serving a jury demand, the *Ford Credit* rule could obviously allow for manipulation of the deadline in a way that is inconsistent with our rules governing pleadings.

> Federal Rule of Civil Procedure 7(a), with its brief list of permissible pleadings and a flat prohibition against any pleading other than those listed, is designed to bring the pleading stage to an early close, eliminate unnecessary written pleadings, and provide a clear and definite guide as to precisely when the point of closure is reached. The pleadings are closed generally once there no longer is any ability to file a pleading called for under Rule 7(a). The time for closing the pleadings is important because it aids in determining whether additional pleadings may be interposed, whether a demand for a jury trial should be filed, whether a party has waived his right to a jury trial by failing to make a timely demand, whether a motion for judgment on the pleadings is in order, or whether the case is at issue for trial.

5 Charles A. Wright et al., *Fed Prac. & Proc.: Civil* § 1189 (4th ed. June 2024 update).[4]

---

[4] W.R.C.P. 7(a) is similar to its federal counterpart. *See Adams v. State*, 2023 WY 85, ¶ 21, 534 P.3d 469, 476 (Wyo. 2023) (Court looks to precedent interpreting similar federal precedent as persuasive authority).

[¶35] Because our rules seek to bring the pleading stage of a case to an early close and to provide certainty as to when closure is reached, we will not adopt a rule that could allow a plaintiff to extend closure indefinitely by delaying entries of default. Because the pleadings were closed at the latest upon the timely answer by Ms. Howard, the district court did not err in ruling that Mr. Traylor waived his right to a jury trial when he failed to timely file and serve his jury demand as required by W.R.C.P. 38.

**B.     The district court did not abuse its discretion in denying Mr. Traylor's Rule 39(b) request for a jury trial.**

[¶36] Rule 39 provides an alternative means to obtain a trial by jury when a party fails to timely demand one. It states, "Issues on which a jury trial is not properly demanded are to be tried by the court. But the court may, on motion, order a jury trial on any issue for which a jury might have been demanded." W.R.C.P. 39(b).

[¶37] We review a district court's denial of a Rule 39(b) motion for an abuse of discretion. *Matter of LCB*, 2023 WY 23, ¶ 13, 525 P.3d 1030, 1034 (Wyo. 2023). "A court does not abuse its discretion unless it acts in a manner which exceeds the bounds of reason under the circumstances." *Id*. (quoting *Matter of Adoption of BGH*, 930 P.2d 371, 377 (Wyo. 1996)). "[W]hen a Rule 38 waiver occurs and a Rule 39 motion is denied, it is the appellant's burden to establish the denial was an abuse of discretion." *LCB*, 2023 WY 23, ¶ 16, 525 P.3d at 1035 (citing *Stroup v. Oedekoven*, 995 P.2d 125, 129 (Wyo. 1999)).

[¶38] Mr. Traylor contends the district court erred in denying him relief under Rule 39(b) because Defendants would not have been prejudiced by a jury trial rather than a bench trial and granting the relief would not have affected the court's docket. Given the course of events, we find no abuse of discretion.

[¶39] In response to Defendants' motions to strike his jury demand, Mr. Traylor did not move for Rule 39(b) relief. He instead asserted in response to the Defendants' motions to strike that the district court had already exercised its Rule 39(b) discretion by setting a jury trial in its initial pretrial order and had done so appropriately because Defendants would not be prejudiced by the setting. The court granted the motions to strike and subsequently clarified that its initial pretrial order was essentially a placeholder subject to Defendants' objections, not an exercise of its Rule 39(b) discretion. Several months after the court struck Mr. Traylor's jury demand, and after the parties were well into discovery, Mr. Traylor asked the court to reconsider its ruling, again asserting only that Defendants would not be prejudiced by setting the matter for a jury trial.

[¶40] We have long subscribed to the view that courts should be "extremely reluctant" to exercise their discretionary power under Rule 39(b) and only upon an "extraordinary showing." *LCB*, 2023 WY 23, ¶ 16, 525 P.3d at 1035 (quoting *Stroup*, 995 P.2d at 129); *see also Patterson v. Maher*, 450 P.2d 1005, 1008 n.2 (Wyo. 1969). We have also

9

repeatedly held that when the failure to make a timely jury demand was an oversight or resulted from a misunderstanding of the Rule 38 requirements, it is not an abuse of discretion to deny Rule 39(b) relief. *LCB*, 2023 WY 23, ¶ 16, 525 P.3d at 1035 (citing *Armstrong v. Pickett*, 865 P.2d 49, 50 (Wyo. 1993)); *Scherling*, 599 P.2d at 1358.

[¶41]  Mr. Traylor at no time offered a reason to the district court for his failure to timely serve his jury demand on Defendants, other than his apparent misunderstanding that the failure of the Rule 19 defendants to answer extended his time under Rule 38. Under these circumstances and considering the caution with which a court must exercise its Rule 39(b) authority, we cannot say that the district court abused its discretion in denying Mr. Traylor's Rule 39(b) request for a jury trial.

## II.    *The district court applied the proper burden of proof in ruling on Mr. Traylor's undue influence claims.*

[¶42]  Mr. Traylor does not challenge the district court's findings of fact but contends the court reached the wrong conclusion from them because it incorrectly required him to prove his undue influence claims by clear and convincing evidence rather than by a preponderance of the evidence.[5] "Whether the district court applied the correct burden of proof is a question of law which we review de novo." *Morningstar v. Robison*, 2023 WY 28, ¶ 15, 527 P.3d 241, 246 (Wyo. 2023) (quoting *Gill v. Lockhart*, 2022 WY 87, ¶ 29, 512 P.3d 971, 980 (Wyo. 2022)).

[¶43]  Because the parties' briefing suggests confusion exists concerning the burden of proof that applies to testamentary undue influence claims, we begin by clarifying that burden of proof. We then turn to the district court's application of the burden of proof.

### A.    **A party challenging a testamentary instrument based on undue influence bears the burden of proving that claim by a preponderance of the evidence.**

[¶44]  To establish that a testamentary trust was the product of undue influence, a claimant must establish four elements:

> 1) the relation between the one charged with exercising undue
> influence and the decedent afforded the former an opportunity

---

[5] In claiming Defendants exerted undue influence on Doc, Mr. Traylor sought to set aside not only the Second Amended Trust but also inter vivos transfers to Defendants. The district court rejected both claims, but because Mr. Traylor's brief does not discuss the inter vivos transfers, the different burden of proof that applies to them, or the court's findings concerning the transfers, we address only the district court's undue influence findings as they pertain to the Second Amended Trust. *See Willey v. Willey*, 2016 WY 116, ¶¶ 19-23, 385 P.3d 290, 297-98 (Wyo. 2016) (distinguishing burden of proof between undue influence challenges to inter vivos transfers and testamentary instruments).

to control the testamentary act; 2) the decedent's condition was such to permit subversion of his freedom of will; 3) there was activity on the part of the person charged with exercising undue influence; and 4) such person unduly profited as a beneficiary under the trust.

*Kibbee v. First Interstate Bank*, 2010 WY 143, ¶ 44, 242 P.3d 973, 988 (Wyo. 2010) (citing *Retz v. Siebrandt*, 2008 WY 44, 181 P.3d 84 (Wyo. 2008)); *see also Meyer v. Miller*, 2014 WY 91, ¶ 21, 330 P.3d 263, 269 (Wyo. 2014).

[¶45]   In an early case, this Court held that "[t]he burden of proof on the issue of undue influence . . . is carried, in general, by a preponderance of the evidence." *Est. of Waters*, 629 P.2d 470, 472 (Wyo. 1981) (quoting 79 Am.Jur.2d, Wills, § 480); *see also In re Merrill's Est.*, 341 P.2d 506, 509-10 (Wyo. 1959) (considering undue influence claim using preponderance of the evidence standard). Since then, we have repeatedly held, without referencing the preponderance of the evidence standard, that undue influence must be established by "clear proof," or by "evidence clearly demonstrating" it. *See Meyer*, 2014 WY 91, ¶ 21, 330 P.3d at 269 ("Appellant therefore bore the burden of proving undue influence by presenting evidence clearly demonstrating that Mrs. Carlsen's free agency was destroyed and that her volition was replaced by that of her other daughters."); *Kelly v. McNeel*, 2011 WY 79, ¶ 18, 250 P.3d 1105, 1110 (Wyo. 2011) ("The party contesting a will bears the burden of proving undue influence by presenting evidence clearly demonstrating that the testator's free agency was destroyed and his volition was substituted for that of another."); *Kibbee*, 2010 WY 143, ¶ 53, 242 P.3d at 988 ("[T]he proponent must . . . [present] 'clear proof of' each of the elements of the undue influence claim."); *Melcher v. Benson* (*In re Est. of McLean*), 2004 WY 126, ¶ 11, 99 P.3d 999, 1004 (Wyo. 2004) ("The will contestant bears the burden of proving undue influence by presenting evidence clearly demonstrating that the testator's free agency was destroyed and that his volition was substituted for that of another."); *Mercado v. Trujillo*, 980 P.2d 824, 826 (Wyo. 1999) ("The burden of proving undue influence rests upon the contestant to provide clear proof that the decedent's free agency was destroyed, and the volition of another was substituted for theirs.").

[¶46]   The question the briefing in this case raises is whether the requirement of clear proof or evidence clearly demonstrating undue influence has elevated the burden of proof from a preponderance of the evidence to clear and convincing evidence. We hold that it has not.

[¶47]   "Wyoming courts apply three standards of proof: preponderance of the evidence, clear and convincing evidence, and proof beyond a reasonable doubt." *Davis v. State*, 2018 WY 40, ¶ 47, 415 P.3d 666, 682 (Wyo. 2018). These are terms of art that carry specific meanings.

"A 'preponderance of the evidence' is defined as proof which leads the trier of fact to find that the existence of the contested fact is more probable than its non-existence." *J.J.F. v. State*, 2006 WY 41, ¶ 9, 132 P.3d 170, 174 (Wyo. 2006) (internal citations and quotation marks omitted). "Clear and convincing evidence," on the other hand, is defined as "that kind of proof which would persuade a trier of fact that the truth of the contention is highly probable." *Id*. ¶ 9, 132 P.3d at 174 (internal citations and quotation marks omitted). Finally, proof beyond a reasonable doubt is required to prove guilt in criminal cases and is the most stringent standard that carries with it the highest evidentiary burden. *Watts v. State*, 2016 WY 40, ¶ 14, 370 P.3d 104, 108-09 (Wyo. 2016); *Corson v. State*, 766 P.2d 1155, 1162 (Wyo. 1988).

*Id*.

[¶48] Our testamentary undue influence cases have not used the term "clear and convincing evidence," or evaluated the evidence to determine whether it was "highly probable" that undue influence was exerted on the testator. *See, e.g.*, *Meyer*, 2014 WY 91, ¶¶ 20-26, 330 P.3d at 269-71; *Kelly*, 2011 WY 79, ¶¶ 18-32, 250 P.3d at 1110-14; *Melcher*, 2004 WY 126, ¶¶ 11, 17, 99 P.3d at 1004-05; *Mercado*, 980 P.2d at 826-27. Moreover, this Court has not expressly abandoned the preponderance of the evidence standard in these cases, and the fact that we have qualified the showing required does not necessarily mean a change in the burden of proof.

[¶49]  For example, in *Benedict v. State*, we reviewed a ruling on a criminal defendant's motion for the return of seized property, made after the criminal proceedings concluded. 2024 WY 55, ¶ 19, 548 P.3d 989, 995 (Wyo. 2024). The State bore the burden of proving it had a legitimate reason to retain the property, and we observed that "[t]he burden on the government is heavy because there is a presumption that the person from whom the property was taken has a right to its return." *Id*. Nonetheless, we held that because it was a civil proceeding, the burden the State had to meet was a showing by a preponderance of the evidence. *Id*. The qualification that the State's burden was heavy because of the property interests involved provided a lens through which the evidence was viewed, but it did not change the burden of proof.

[¶50]  We view the use of the terms "clear proof" and "evidence clearly demonstrating" undue influence likewise. "In Wyoming, estate planning documents 'deliberately made by a person of sound mind will not be lightly set aside.'" *Meyer*, 2014 WY 91, ¶ 21, 330 P.3d at 269 (quoting *Kelly*, 2011 WY 79, ¶ 18, 250 P.3d at 1110). Like the "heavy burden" in *Benedict*, the clear evidence requirement in undue influence cases is the lens through which the factfinder views the evidence. It ensures that the testator's expressed

wishes are not lightly set aside, but it does not change the burden of proof, which remains a preponderance of the evidence.[6]

## B. The district court did not require Mr. Traylor to prove his testamentary undue influence claims by clear and convincing evidence.

[¶51] At the outset of its analysis of Mr. Traylor's undue influence claims, the district court stated, "Plaintiff has failed to meet his burden of 'clearly demonstrating' that Doc's 'free agency was destroyed' and his 'volition was substituted for that of another[.]'" The court repeated this observation at the conclusion of its analysis. Mr. Traylor contends this shows the court applied a clear and convincing burden of proof rather than the required preponderance of the evidence standard. We disagree.

[¶52] Between the district court's two statements concerning Mr. Traylor's failure to clearly demonstrate his testamentary undue influence claims, it analyzed each element of the claims based on its findings of fact. The court at no point used the term clear and convincing evidence; nor did it conclude that Mr. Traylor failed to persuade the court that the truth of his contention was highly probable.

[¶53] In the prelude to its discussion of the testamentary undue influence claim, the district court cited the admonition that "a will deliberately made by a person of sound mind is not to be lightly set aside." In its discussion of the claim's elements, there is no indication that the court did anything other than adhere to this precept. It found that Mr. Traylor proved that based on Defendants' relationships with Doc, they had an opportunity to control his testamentary acts. But it also concluded that "there is no persuasive evidence that the Defendants did in fact exercise that opportunity." As to Doc's condition, the court cited the testimony of his physicians, a caretaker, his attorney, and Mr. Traylor himself, and concluded Mr. Traylor "failed to establish through competent evidence that, at the time he executed his Wyoming Estate Plan, Doc's condition was such as to permit subversion of his freedom of will." As to whether Defendants unduly profited under the amended trust, the court considered the understood value of the trust and found there was insufficient evidence to establish that Mr. Kraft's $150,000 fee as trustee was undue. As to Mr. Dandurand and the Greens, the court

---

[6] In *Brug v. Case*, a case that concerned an inter vivos transfer of property, this Court implied that "clear proof" is something greater than a preponderance of the evidence. 600 P.2d 710, 714-15 (Wyo. 1979). In *Waters*, this Court quoted those statements from *Brug*, 629 P.2d at 473-74. It further held, speaking to a claim of testamentary undue influence but once again citing *Brug*, that "once there is clear proof of suspicious circumstances, . . . a simple preponderance of the evidence will support a finding of undue influence." *Id*. at 474. To the extent these cases suggested that the requirement of "clear proof" elevates the burden of proof for a testamentary claim of undue influence, we overrule them. We also overrule the holding in *Waters* that the burden of proof for a testamentary claim of undue influence may change depending on the presence of "suspicious circumstances."

concluded there was "no evidence" they unduly profited, given that they arranged for Doc's care and were his closest companions in his last years.

[¶54]  In sum, there is no indication the district court imposed on Mr. Traylor the burden of proving his undue influence claim by clear and convincing evidence. Moreover, the court found no evidence to support two of the elements, so the court's ruling was not a close one that came down to which burden of proof it applied. We thus find no error in the court's application of the burden of proof.

### III.    The district court did not err in ruling that the no-contest clause of the Second Amended Trust was enforceable against Mr. Traylor.

[¶55]  The Second Amended Trust contained a no-contest clause that provided in relevant part:

> Any and every individual (singly or in conjunction with any other person or persons) who is or who may become a Beneficiary under this Trust Agreement who shall contest, attack or seek to impair or invalidate in any court any provision of the . . . within Trust Agreement . . . [t]he Will of Grantor or any codicil to any Will of Grantor . . .
>
> . . .
>
> or who shall not defend or assist in good faith in the defense of any and all such contests or claims, shall not be entitled to any benefits under any Trust created hereby[.]

[¶56]  Article 8.2 of the Second Amended Trust defined the term beneficiary as follows:

> The term "Beneficiary" shall be deemed to mean and is intended to include only those persons for whom a part of the Trust Estate has been apportioned. The term "Beneficiary" shall specifically not include any person who legally might be considered as a residuary or contingent Beneficiary, and any such person shall be considered as a "Beneficiary" only at such time as a part of the Trust Estate actually has been apportioned for his or her use and benefit in accordance with the terms and provisions of this Trust Agreement or any amendments thereto.

14

[¶57]  Mr. Traylor contends that because he is a residuary beneficiary under the trust, he is not a "Beneficiary" subject to the no-contest clause. He thus claims the district court erred in holding the no-contest clause was enforceable against him. We disagree.

[¶58]  Interpretation of a trust is a matter of law this Court reviews de novo. *Spurlock v. Wyo. Tr. Co.*, 2024 WY 19, ¶ 14, 542 P.3d 1071, 1076 (Wyo. 2024) (citing *Aimone v. Aimone*, 2023 WY 43, ¶ 20, 529 P.3d 35, 42 (Wyo. 2023)). "The meaning of a trust is determined by the same rules that govern the interpretation of contracts." *Aimone*, 2023 WY 43, ¶ 26, 529 P.3d at 43 (quoting *Gowdy v. Cook*, 2020 WY 3, ¶ 39, 455 P.3d 1201, 1210 (Wyo. 2020)).

[¶59]  The parties do not contend that the relevant provisions of the Second Amended Trust are ambiguous, and we find no ambiguity. We therefore look "to the four corners of the document to interpret the trust language." *Aimone*, 2023 WY 43, ¶ 21, 529 P.3d at 42 (citing *Prancing Antelope I, LLC v. Saratoga Inn Overlook Homeowners Ass'n*, 2021 WY 3, ¶ 26, 478 P.3d 1171, 1179 (Wyo. 2021)).

> The primary purpose of trust interpretation is to determine the settlor's intent. We determine the settlor's intent from the plain language contained in the four corners of the document. We construe the trust document as a whole and avoid a construction which renders a provision meaningless with any apparent conflicting language reconciled by a reasonable, alternate interpretation rather than nullifying an apparent conflicting provision.

*Spurlock*, 2024 WY 19, ¶ 14, 542 P.3d at 1076 (cleaned up).

[¶60]  The no-contest clause of the Second Amended Trust applies to "[a]ny and every individual . . . who is or who may become a Beneficiary" under the trust. In a separate provision, the trust defines a "Beneficiary" to include those "for whom a part of the Trust Estate has been apportioned." It excludes any contingent or residuary beneficiary until such time as a part of the estate has been apportioned to that individual.

[¶61]  Under the Second Amended Trust, Mr. Traylor was apportioned $100,000 and a 10.58% residual interest in the trust estate. Despite the $100,000 apportionment, Mr. Traylor contends that he is a residuary beneficiary excluded from the definition of "Beneficiary," and thus not subject to the no-contest clause. We reject this argument for two reasons.

[¶62]  First, Mr. Traylor's proposed interpretation ignores the requirement that we read the provision defining "Beneficiary" as a whole, giving meaning to all its parts. By its plain terms, the trust defines a beneficiary to mean someone who has been apportioned a

15

part of the estate. Mr. Traylor's interpretation asks us to ignore that part of the definition and look only to the language governing residuary beneficiaries. Notably, once a residuary or contingent beneficiary is apportioned part of the estate, that individual qualifies as a "Beneficiary." Reading the provision as a whole, the clear intent was that someone who has only a residuary or contingent interest in the estate is not a "Beneficiary." Anyone who is apportioned a part of the estate is a "Beneficiary." Mr. Traylor was apportioned part of the estate and was thus a "Beneficiary" subject to the no-contest clause.

[¶63] The second flaw in Mr. Traylor's argument is that it presumes that the no-contest clause applies only to a "Beneficiary." By the provision's plain terms, that is not the case. The no-contest clause applies to "[a]ny and every individual . . . who is or *who may become* a Beneficiary" under the trust. A residuary beneficiary is someone who may become a beneficiary under the trust, and a residuary beneficiary is therefore expressly subject to the no-contest clause. As a residuary beneficiary, Mr. Traylor was subject to the no-contest clause.

[¶64] Our task in interpreting a trust is to give effect to the settlor's intent, and Doc clearly intended a broad no-contest clause. The district court did not err in ruling the clause was enforceable against Mr. Traylor.

### IV. *Based on the record before this Court, we can find no abuse of discretion in the district court's award of costs.*

[¶65] After the district court entered judgment in favor of Defendants, Defendants Davina and David Green moved for costs in the amount of $7,158.80. The Greens' motion included invoices but provided no discussion of the allowability of the costs. Mr. Traylor objected to the motion, and the Greens replied. The court awarded the Greens the full amount of the requested costs for the reasons stated in their motion. On appeal, Mr. Traylor asks this Court to reduce the award of costs to the Greens by $2,178.75.

[¶66] Defendant Brian Dandurand also moved for costs, with his motion seeking a total of $7,576.75. Mr. Dandurand's motion contained a more detailed discussion of the allowability of the costs. Mr. Traylor objected, and Mr. Dandurand replied. The district court awarded the full amount of the requested costs for the reasons stated in Mr. Dandurand's motion.[7] On appeal, Mr. Traylor asks the Court to reduce the award of costs to Mr. Dandurand by $2,804.00.

---

[7] The district court issued an order amending both of its awards of costs in this case. The amended order corrected its earlier ruling that Mr. Traylor's objections to the motions to costs were untimely but otherwise left the orders unchanged.

[¶67]   We review an award of costs for abuse of discretion. *Weinstein v. Beach*, 2014 WY 167, ¶ 8, 340 P.3d 1013, 1016 (Wyo. 2014) (citing *Beckwith v. Weber*, 2012 WY 62, ¶ 32, 277 P.3d 713, 721 (Wyo. 2012)). A "court may award and tax costs and apportion them between the parties on the same or adverse sides as it deems right and equitable." *Bellis v. Kersey*, 2010 WY 138, ¶ 23, 241 P.3d 818, 825 (Wyo. 2010) (quoting Wyo. Stat. Ann. § 1–14–126(a)). It abuses its discretion when it acts in a manner that exceeds the bounds of reason under the circumstances. *Corley v. Wyo. Rents, LLC*, 2024 WY 51, ¶ 26, 547 P.3d 333, 338 (Wyo. 2024) (citing *Circle C Res. v. Hassler*, 2023 WY 54, ¶ 22, 530 P.3d 288, 295 (Wyo. 2023)). The burden is on the party attacking the trial court's ruling to establish an abuse of discretion. *Weinstein*, 2014 WY 167, ¶ 8, 340 P.3d at 1016 (quoting *Jones v. Artery*, 2012 WY 63, ¶ 8, 275 P.3d 1244, 1247 (Wyo. 2012)).

[¶68]   "It is not appropriate for 'this Court to reverse a district court ruling on grounds that were never presented to it.'" *TEP Rocky Mountain LLC v. Record TJ Ranch Ltd. P'ship*, 2022 WY 105, ¶ 63, 516 P.3d 459, 478 (Wyo. 2022) (quoting *Miller v. Beyer*, 2014 WY 84, ¶ 34, 329 P.3d 956, 967 (Wyo. 2014)).

> This is particularly true when our review is for an abuse of discretion because to determine whether there was an abuse we necessarily must consider the arguments and evidence presented to the district court. Plainly stated, a party cannot fail to present an argument and then argue on appeal that the district court abused its discretion in not considering the argument the party did not present.

*Id*.

[¶69]   The difficulty we have in this case is that Mr. Traylor did not designate his objections to the motions for costs, or Defendants' replies, as part of the record. We therefore do not know what objections were presented to the district court or how they were argued. Nor do we know how Defendants responded. In other words, we do not know the facts or reasoning with which the court was presented and how that may have informed its exercise of discretion.

[¶70]   "We have cautioned that 'the appellant bears the responsibility of bringing forth a sufficient record for the Court's review. When he does not, we assume that the district court's orders and rulings were correct, and summarily affirm the district court's decision.'" *Engebretsen v. Engebretsen*, 2022 WY 164, ¶ 19, 522 P.3d 156, 162 (Wyo. 2022) (quoting *Rush v. Golkowski*, 2021 WY 27, ¶ 16, 480 P.3d 1174, 1178 (Wyo. 2021)). Without an adequate record against which to evaluate the district court's exercise of discretion in awarding costs to Defendants, we must affirm.

[¶71]   Affirmed.